Sanjay Wadhwa
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281-1022
(212) 336-0181

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,  :
                                     :
                         Plaintiff,  :
                                     :
            -against-                :
                                     :
H. CLAYTON PETERSON,                 :
DREW CLAYTON PETERSON,               :
DREW K. BROWNSTEIN,                  :
 and                                 :
BIG 5 ASSET MANAGEMENT, LLC,         :
                                     :
                         Defendants. :
                                     :

---

RECEIVED
OCT 21 2011
U.S.D.C. S.D. N.Y.
CASHIERS

11 Civ. 5448 (RPP)

ECF CASE

AMENDED
COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendants H. Clayton Peterson ("Clayton Peterson"), Drew Clayton Peterson ("Drew Peterson"), Drew K. Brownstein ("Brownstein"), and Big 5 Asset Management, LLC ("Big 5") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1. This case concerns insider trading in the securities of Mariner Energy, Inc. ("Mariner") in advance of the April 15, 2010 announcement that Apache Corporation ("Apache") had agreed to acquire Mariner (the "Mariner Announcement").

2.   In the week leading up to the announcement, Clayton Peterson, a member of Mariner's board of directors, tipped his son, Drew Peterson, on multiple telephone calls and at in-person meetings about Apache's impending acquisition of Mariner.

3.   Based on this material nonpublic information, Drew Peterson, a managing director at a registered investment adviser, purchased shares for his own accounts, for his relatives, for his clients, and for a close friend. Drew Peterson also tipped other close friends as to the impending acquisition of Mariner, including Brownstein who was then the chief executive officer and portfolio manager at Big 5, a hedge fund adviser.

4.   Altogether, Drew Peterson, his relatives, clients, and friends reaped more than $5.2 million in ill-gotten profits from insider trading in Mariner securities as alleged herein. Of this amount, Brownstein alone reaped approximately $5 million from trading Mariner securities in his own account, the accounts of his relatives, and the accounts of two hedge funds managed by Big 5, the Lion Global Fund LLLP and the Lion Global Offshore Master Fund Ltd. (collectively, the "Big 5 hedge funds").

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5.   The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against each of the defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement, on a joint and several basis, of all ill-gotten gains or losses avoided from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] under the Insider Trading and Securities

Fraud Enforcement Act of 1988. The Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7. Venue lies in this Court pursuant to Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York. Many of the tips that Drew Peterson provided to Brownstein were conveyed via telephone while Brownstein was physically located in New York, New York, and Brownstein was in New York, New York when he directed various brokers to purchase Mariner securities for the Big 5 hedge funds, for his relatives, and for his own account. The brokerage firm through which Big 5 placed its trades was also located in New York, New York. In addition, Mariner stock was traded on the New York Stock Exchange ("NYSE").

## DEFENDANTS

8. **Clayton Peterson**, age 66, resides alternately in Denver, Colorado; Phoenix, Arizona; and Cabo San Lucas, Mexico. From 2006 through 2010, he was a member of Mariner's board of directors. Now retired, he was a certified public accountant and the Managing Director of Arthur Andersen's Denver office from approximately 2000 until 2002. He also served on the boards of directors of the real estate company, RE/Max International, Inc., and the oil and gas company, Lone Pine

3

Resources, Inc.

9. **Drew Peterson**, age 35, resides in Denver, Colorado. He is the son of Clayton Peterson and, during the relevant period, worked as a financial adviser for a registered investment adviser based in Denver, Colorado. While working at this investment adviser, Drew Peterson held a Series 65 license.

10. **Brownstein**, age 35, resides in Denver, Colorado and is a longtime friend of Drew Peterson. Brownstein is the founder and chief executive officer of the registered investment adviser and hedge fund management firm Big 5.

11. **Big 5**, a Colorado limited liability company, is a registered investment adviser based in Denver, Colorado. Big 5 serves as the investment adviser to multiple hedge funds including the Lion Global Fund LLLP and the Lion Global Master Fund Ltd.

## OTHER RELEVANT ENTITIES

12. **Blind Seven LLC** ("Blind Seven"), a Colorado limited liability company, is an investment club founded in 1999 by Drew Peterson and some of his friends for the purpose of making joint investments. At all relevant times, Drew Peterson was a director of Blind Seven and exercised control over the company and its investment decisions.

13. **Mariner** is a Delaware corporation headquartered in Houston, Texas. Mariner is an oil and gas exploration, development and production company. Mariner's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and, until Apache finalized its acquisition of Mariner on November 11, 2010, its common stock traded on the NYSE under the symbol "ME."

14. **Apache** is a Delaware corporation headquartered in Houston, Texas. Apache is an energy company that explores for, develops and produces natural gas, crude

oil and natural gas liquids. Apache's securities are registered with the Commission pursuant to Section12(b) of the Exchange Act and its common stock is listed on the NYSE and the Chicago Stock Exchange and quoted on the NASDAQ National Market under the symbol "APA."

## FACTS

15. In the week leading up to the announcement of Apache's agreement to acquire Mariner, Clayton Peterson, a member of Mariner's board of directors, repeatedly tipped his son, Drew Peterson, about the impending acquisition. Drew Peterson used the material nonpublic information he received from his father to purchase Mariner securities for his own accounts, for an investment club, for his relatives, for clients of the investment advisory firm where he worked at the time, and for a close friend. In addition, Drew Peterson tipped other close friends, including Brownstein, who then traded based on the material nonpublic information.

16. As a result of this trading, Drew Peterson, his relatives, clients and friends generated more than $5.2 million in ill-gotten profits. Of this amount, Brownstein alone reaped approximately $5 million from trading Mariner securities in his own account, the accounts of his relatives and the accounts of the Big 5 hedge funds.

**Clayton Peterson's Tipping of Inside Information to
Drew Peterson and Corresponding Trading of Mariner Securities**

17. In or about late March 2010, Apache and Mariner entered into discussions concerning a potential business combination between the two companies and executed a written confidentiality agreement whereby they agreed to keep these discussions confidential. On April 7, 2010, Apache sent Mariner a proposed term sheet for the

acquisition. The term sheet made clear that the proposal must be accepted by Mariner on or before April 14, 2010.

18. The same day that it received Apache's term sheet, the Mariner board of directors convened a special meeting by telephone to discuss Apache's proposal. At that special meeting, the board resolved to hire a financial adviser to advise it on the proposed transaction and directed the Mariner CEO to tell Apache that Mariner was "seriously considering" the Apache proposal and would respond promptly.

19. As a member of Mariner's board, Clayton Peterson participated in the April 7, 2010, Mariner board meeting, and, therefore, was privy to Apache's offer, Mariner's response to it, and the proposed timeframe of the potential acquisition.

20. Notwithstanding his duty to keep Mariner's discussions with Apache confidential, Clayton Peterson tipped his son, Drew Peterson, about Apache's impending acquisition of Mariner as discussed below.

21. On the evening of April 7 or the early morning of April 8, 2010, Clayton Peterson contacted Drew Peterson and stated that he had recently attended Mariner board of directors meetings, which concerned positive developments for the company.

22. During that telephone call, Clayton Peterson explicitly told Drew Peterson to purchase Mariner stock for Clayton Peterson's daughter (that is, Drew Peterson's sister), who maintained an account at the investment advisory firm where Drew Peterson was employed.

23. After speaking to Clayton Peterson, Drew Peterson purchased 2,000 shares of Mariner stock for his sister's account on the morning of Thursday, April 8, 2010.

24. Later that same day, Clayton Peterson visited Drew Peterson's office at the investment advisory firm where Drew Peterson worked. During that meeting, Drew Peterson informed his father that he had bought 2,000 shares of Mariner stock for his sister, and Clayton Peterson told Drew Peterson that he should buy even more Mariner stock for her.

25. Shortly after Clayton Peterson left the office, Drew Peterson purchased an additional 2,000 shares of Mariner stock for his sister.

26. Minutes later, Drew Peterson also purchased 500 shares of Mariner stock for Blind Seven, the investment club that Drew Peterson managed for himself and some of his friends.

27. After speaking with Clayton Peterson on Saturday, April 10, Drew Peterson purchased more Mariner stock for himself and his relatives and clients early the next week. On Monday, April 12, Drew Peterson purchased an additional 1,000 shares of Mariner stock for Blind Seven, 1,200 shares of Mariner stock for his own accounts, and 1,000 shares of Mariner stock for a custodial account that he managed for his niece.

28. That same day and the following morning, Drew Peterson also arranged for four of his clients at the investment advisory firm where he worked to purchase a total of 4,100 shares of Mariner, and for a close friend to purchase 500 shares of Mariner.

29. On the evening of April 12, Clayton Peterson telephoned Drew Peterson and informed him that Mariner's board of directors had held lengthy telephonic meetings throughout the day and that Mariner was going to be acquired and would not be a public company by the end of the week.

30. The following morning, April 13, Drew Peterson purchased an additional 1,000 shares of Mariner stock for Blind Seven.

31. On the evening of Wednesday, April 14, 2010, Clayton Peterson telephoned Drew Peterson again and advised him that Mariner was going to be acquired by Apache for approximately $25 per share, and that the cable news channel CNBC would cover the announcement early the next morning.

32. As Clayton Peterson had stated, Apache and Mariner announced the acquisition in a joint press release issued prior to the opening of trading on April 15. Following the announcement, Mariner's share price rose approximately 42 percent, from $18.09 (the closing price on April 14) to $25.68 (the closing price for April 15).

33. In the days following the Mariner Announcement, Drew Peterson and his relatives and clients sold the Mariner stock that he had accumulated for them prior to the acquisition announcement and amassed more than $100,000 in ill-gotten profits. Specifically, Drew Peterson reaped approximately $9,000 for himself, $19,000 for his investment club Blind Seven, $42,000 for his sister and his niece, and $32,000 for his four clients and a close friend.

**Drew Peterson's Tipping of Inside Information to
Brownstein and Corresponding Trading of Mariner Securities**

34. In addition to using material nonpublic information to purchase Mariner securities for the benefit of himself, his investment club, his relatives, his clients, and a close friend, Drew Peterson also passed along the material nonpublic information concerning the impending acquisition of Mariner to multiple close friends, including Brownstein. Based on the material nonpublic information that Drew Peterson provided,

Brownstein profitably traded Mariner securities for the Big 5 hedge funds, his relatives, and himself.

35.  Leading up to the Mariner Announcement, Drew Peterson repeatedly tipped Brownstein of the impending acquisition. On Thursday, April 8, after Clayton Peterson had delivered the initial tip to Drew Peterson and advised him to buy Mariner stock for his sister, Drew Peterson told Brownstein that he should buy Mariner stock because Clayton Peterson had recently attended Mariner board meetings and something good was going to happen for Mariner.

36.  On Saturday, April 10, Drew Peterson and Brownstein once again discussed Mariner. During this conversation, Drew Peterson repeated that his father had recently attended Mariner board of directors meetings and Drew Peterson expressed confidence that Mariner was going to be acquired.

37.  On the morning of Monday, April 12, Brownstein, who was in New York City, arranged for the Big 5 hedge funds to purchase a total of 200,000 shares (or approximately $3.3 million worth) of Mariner stock. Later that morning, Brownstein increased his bet that Mariner's stock price would rise, arranging for the Big 5 hedge funds to purchase 1,488 option contracts to buy Mariner stock. This was the first time that the Big 5 hedge funds had ever traded Mariner equities or options.

38.  On the evening of Monday, April 12, less than a minute after speaking to Clayton Peterson and learning that Mariner would not be a public company by the end of the week, Drew Peterson telephoned Brownstein's mobile phone and left a voice message indicating that Mariner was about to be acquired. The next morning, Brownstein returned Drew Peterson's phone call, and the two men had a three-minute conversation.

39. Minutes after Brownstein's call with Drew Peterson on the morning of April 13, Brownstein, who was still in New York City, substantially increased the Big 5 hedge funds' long position in Mariner by purchasing more option contracts to buy Mariner stock and also purchased Mariner securities for his relatives. That day, Brownstein caused the Big 5 hedge funds to purchase a total of 2,512 Mariner option contracts to buy Mariner stock and his relatives to purchase a total of 25,000 shares of Mariner stock and 200 option contracts to buy Mariner stock.

40. On the evening of April 13, Brownstein called Drew Peterson again and they discussed the material nonpublic information that Drew Peterson had received from his father concerning the impending acquisition of Mariner.

41. The next day, Wednesday, April 14 (the day before the acquisition was announced), Brownstein purchased 200 option contracts to buy Mariner stock for his personal brokerage account, and increased the Big 5 hedge funds' bullish position in Mariner securities by purchasing an additional 1,000 option contracts to buy Mariner stock.

42. In the days following the Mariner Announcement, Brownstein liquidated the positions he had accumulated in Mariner securities. As a result of this trading, Brownstein reaped approximately $4.6 million for the Big 5 hedge funds, $305,000 for his relatives, and $130,000 for himself.

## CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(Against all Defendants)**

43. The Commission realleges and incorporates by reference paragraphs 1 through 42, as though fully set forth herein.

44. The information that defendant Clayton Peterson provided to defendant Drew Peterson was material and nonpublic. In addition, the information was considered confidential by Mariner, the company that was the source of the information, and Mariner had policies protecting confidential information.

45. Clayton Peterson learned the material nonpublic information that he conveyed to Drew Peterson as a result of his service on the board of directors of Mariner, and Clayton Peterson knew, recklessly disregarded, or should have known, that he owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the information confidential.

46. Clayton Peterson tipped material nonpublic information to Drew Peterson with the expectation that Drew Peterson would use the information to benefit himself and Clayton Peterson's daughter.

47. Drew Peterson knew, recklessly disregarded, or should have known, that the material information that he received from Clayton Peterson was conveyed in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence.

48. Drew Peterson used the material nonpublic information that he received from Clayton Peterson to purchase Mariner securities for himself, his sister, his niece, his investment club, his clients, and a close friend.

49. Drew Peterson also tipped material nonpublic information to multiple friends, including Brownstein, with the expectation of receiving benefits.

50. Brownstein knew, recklessly disregarded, or should have known, that the material information that he received from Drew Peterson was disclosed or misappropriated in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence.

51. Brownstein used the material nonpublic information that he received from Drew Peterson to purchase Mariner securities for himself, his relatives, and for the Big 5 hedge funds.

52. Brownstein is liable for the Big 5 hedge funds' trading because he controlled Big 5 and the Big 5 hedge funds, and directly or indirectly effectuated the trades on behalf of the Big 5 hedge funds, and/or unlawfully disclosed the material nonpublic information to the Big 5 hedge funds.

53. Brownstein's unlawful trading on behalf of the Big 5 hedge funds is attributable to Big 5.

54. By virtue of the foregoing, defendants Clayton Peterson, Drew Peterson, Brownstein, and Big 5, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts,

practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

55.     By virtue of the foregoing, defendants Clayton Peterson, Drew Peterson, Brownstein, and Big 5, each, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **RELIEF SOUGHT**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining defendants Clayton Peterson, Drew Peterson, Brownstein, and Big 5 from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering defendants Clayton Peterson, Drew Peterson, Brownstein, and Big 5 to disgorge, with prejudgment interest, all illicit trading profits, other ill-gotten gains received, and/or losses avoided as a result of the conduct alleged in this Complaint, including, as to each of the Defendants, their own illicit trading profits, other ill-gotten gains, and/or losses avoided, and, on a joint and several basis, the illicit trading profits, other ill-gotten gains, and/or losses avoided of their direct and downstream tippees;

**III.**

Ordering defendants Clayton Peterson, Drew Peterson, Brownstein, and Big 5 to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u-1];

**IV.**

Barring defendant Clayton Peterson, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2), from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

**V.**

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       October 21, 2011

                                                    *Sanjay Wadhwa*
                                                    ―――――――――――――
                                                    Sanjay Wadhwa
                                                    Deputy Chief, Market Abuse Unit,
                                                     and Associate Regional Director
                                                    Attorney for Plaintiff
                                                    SECURITIES AND EXCHANGE
                                                    COMMISSION
                                                    New York Regional Office
                                                    3 World Financial Center, Suite 400
                                                    New York, New York 10281-1022
                                                    (212) 336-0181

Of Counsel:
Daniel M. Hawke* (HawkeD@sec.gov)
Preethi Krishnamurthy (KrishnamurthyP@sec.gov)
Joseph G. Sansone (SansoneJ@sec.gov)

* *not admitted in the S.D.N.Y.*